# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

SHAWN MILLER,
*Defendant.*

No. 3:15-cr-00113 (JAM)

## ORDER DENYING MOTION FOR SENTENCE REDUCTION

Shawn Miller is a prisoner of the Federal Bureau of Prisons ("BOP"). In light of the rapidly spreading coronavirus ("COVID-19"), he moves under 18 U.S.C. § 3582(c)(1)(A) for a reduction of his sentence of imprisonment to allow for his release. Although I appreciate Miller's urgent wish to return to his supportive family, I am not convinced that he has established the extraordinary and compelling reasons that are required to justify a sentence reduction or that he has shown that the purposes of sentencing and the protection of the community will be served if he were to be released at this time. Accordingly, I will deny the motion.

### BACKGROUND

On November 1, 2016, I sentenced Miller principally to a term of 90 months of imprisonment following his guilty plea to a charge of conspiracy to possess with intent to distribute heroin and crack cocaine. Doc. #425. At his sentencing, I adopted the factual findings set forth in the U.S. Probation Office's presentence report. Doc. #463 at 6.

According to the presentence report, Miller played a leadership role in a drug distribution operation. Doc. #356 at 6 (¶ 7). Including relevant conduct, he and a co-defendant were responsible for the sale of at least 1 kilogram of heroin and 280 grams of crack cocaine. *Id.* at 9 (¶ 23). It did not appear that Miller's misconduct was motivated by addiction but by a desire to

benefit financially, including using part of the profits to purchase luxury items for him and his wife. *Id.* at 8 (¶¶ 17, 20); Doc. #463 at 68-69.

Although his recommended Sentencing Guidelines range was for 155 to 188 months of imprisonment, Doc. #463 at 9; Doc. #422 at 1, I varied sharply downward to a term of 90 months of imprisonment in light of his difficult childhood, his contrition, his strong family support structure, and otherwise recent positive involvement at home and in the community, Doc. #463 at 70-72. Still, I declined to sentence Miller to his requested mandatory minimum of 60 months' imprisonment, *id.* at 73, in consideration of factors such as just punishment—"what . . . society should reasonably expect in terms of condemning the kind of drug-dealing activity in the supervisory role that [Miller] took here and in light of somebody who has been through it so many times before"—as well as deterrence—"what's necessary in terms of a sentence to absolutely make clear to [Miller] that this is a completely unacceptable form of life," *id.* at 66.

Initially, Miller was incarcerated at FCI Berlin in New Hampshire, where he alleges that he participated in about 20 rehabilitative programs. Doc. #537 at 6. In or around January 2020, he was accepted into the Residential Drug Abuse Program ("RDAP"), but this program was not offered at FCI Berlin. *Id.* at 7; Doc. #537-1 at 3. Miller was temporarily transferred to MDC Brooklyn in New York, Doc. #537-3 at 2, pending his transfer to an unspecified prison that offered RDAP, Doc. #537 at 7. But because of the spread of COVID-19, he has been stuck in lockdown at MDC Brooklyn. *Id.* Miller is scheduled to complete his term of imprisonment about two-and-a-half years from now in April 2023. Doc. #537-3 at 2. If he successfully completes RDAP, he could be released as early as April 2022. *See* 18 U.S.C. § 3621(e)(2)(b).

Miller is 36 years old and alleges that he suffers from unchecked blood glucose levels, a growing abdominal hernia, anxiety, and occasional difficulty breathing associated with his

anxiety and a recent surgery to remove a severe bowel obstruction. Doc. #537 at 13-15. He alleges that these conditions in combination with indifference by MDC Brooklyn medical staff place him at intolerable risk of contracting COVID-19 and suffering its worst effects. *Id.* at 12-15. In my view, however, the record does not bear out Miller's claim that his medical condition makes him extraordinarily vulnerable to COVID-19.

During an inpatient stay in October 2019, Miller received laboratory tests showing that his blood sugar levels were high and in the range that places him at increased risk of developing diabetes. Doc. #541-3 at 51. But Miller has not been diagnosed with diabetes, and he has not produced any support for his allegation that "medical staff at FCI Berlin told Shawn that his blood sugar levels would be monitored, but MDC Brooklyn has failed to conduct any blood or other tests." Doc. #537 at 15. His records do, however, show that in October 2019 he was "educated on recent blood work results and importance of nutritious food choices and how to avoid fats and sugars." Doc. #541-2 at 88. After Miller was transferred to MDC Brooklyn, he was counseled in March 2020 on "maintaining a heart healthy diet, regular aerobic exercise (within individual limitations), maintaining proper body weight, and avoiding tobacco products." *Id.* at 3. He appears to have lost significant weight during that time, dropping from 210 pounds in October 2019 to 185 pounds in March 2020. Doc. #541-3 at 19.

During a visit to Androscoggin Valley Hospital's emergency department in October 2019, Miller was found to have an inguinal hernia. Doc. #537-4 at 8. Miller alleges that this hernia has grown from the size of a "pea" to that of a "golf ball" and has gone untreated by MDC Brooklyn medical staff, Doc. #537 at 14, but this assertion is not corroborated by medical records. A January 2020 evaluation in the same department found no hernias on palpation. Doc. #541-3 at 66.

The only mentions of anxiety in Miller's medical records are two appointments with a psychologist in March and May 2020, in which he stated that he was anxious and worried about his health and his family and was counseled accordingly. Doc. #541-3 at 42, 44. He does not appear to have a formal diagnosis of anxiety.

During Miller's October 2019 emergency room visit, he complained of shortness of breath. Doc. #537-4 at 4. He again complained of difficulty breathing in January 2020, Doc. #541-2 at 19, when MDC Brooklyn medical staff examined him and found that he had "mild shortness of breath with oxygen saturation at 93% on room air," *id.* at 15. Later that day, he visited the emergency department and was given a chest radiograph that revealed "[s]lightly low lung volumes/poor inspiratory effort" but "otherwise clear" lungs, resulting in an impression of "[n]o acute cardiopulmonary process." Doc. #537-4 at 27, 32-33. During Miller's March 2020 visit to the psychologist, he "was observed to be taking abnormally deep breaths," but it was unclear "whether this was intentional or due to breathing difficulties." Doc. #541-3 at 44. In April 2020, Miller wrote to medical staff at MDC Brooklyn complaining of shortness of breath but was told that "[w]hile I am can sent you [*sic*] out to a hospital to be checked, you will be at high risk then of exposure to COVID," and to "[p]lease consider how you feel and if you think it is worth the risk." Doc. #537-5 at 2.

During Miller's October 2019 emergency room visit, Miller complained of severe abdominal pain and was found to have a small bowel obstruction caused by scar tissue related to a gunshot wound that he suffered as a teenager. Doc. #537-4 at 7-8, 10-11; Doc. #541-3 at 98. Not long after, he underwent a lysis of adhesions in an effort to resolve the obstruction. Doc. #541-3 at 98. He had an extended and painful hospital stay. *Id.* After the procedure, Miller "continued to improve" to the point where he "only had a partial small bowel obstruction on CT"

4

and was discharged at the end of the month. *Id.* At a follow-up in November 2019, his abdominal incision was found to be "well healed," and his diagnosis was marked as "resolved." Doc. #541-2 at 26; Doc. #541-3 at 86.

In January 2020, Miller returned to the hospital with complaints of abdominal pain, but imaging did not show any obstruction. Doc. #541-3 at 62, 65. In May 2020, Miller told a psychologist that he still had concerns about his abdominal health but was reluctant to share those concerns with medical staff at MDC Brooklyn out of fear they would send him to a hospital where he might be at greater risk of contracting COVID-19. *Id.* at 42.

There is little support for Miller's claim that MDC Brooklyn's response to COVID-19 has been inadequate and that the conditions there are "dire." Doc. #537 at 12. According to the BOP's website, MDC Brooklyn has about 1,419 inmates.[1] Yet, MDC Brooklyn reports no current cases of COVID-19 among inmates and only three active cases of COVID-19 involving a staff member, along with 12 inmates and 41 staff members having recovered and none having died.[2]

Miller has filed a motion for sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A), along with a supplemental memorandum in support. Docs. #536, #537. The Government has filed an opposition memorandum. Doc. #540. The parties do not dispute that Miller has properly exhausted the administrative procedures required before the filing of his motion for release.

---

[1] *See* Federal Bureau of Prisons, MDC Brooklyn, available at https://www.bop.gov/locations/institutions/bro/ [https://perma.cc/3NWL-EGV7] (last accessed Sept. 2, 2020).
[2] *See* Federal Bureau of Prisons, COVID-19 Coronavirus, COVID-19 Inmate Test Information, available at https://www.bop.gov/coronavirus [https://perma.cc/BXR6-SKS5] (last accessed Sept. 2, 2020); *see also* Doc. #537 at 12 (citing the same source of data).

DISCUSSION

I will first review the statutory and regulatory framework that governs motions under 18 U.S.C. § 3582(c)(1)(A). Then I will address how these factors apply to this case.

### *Statutory and regulatory framework*

Federal law allows a court to grant a "compassionate release" motion to reduce a federal prisoner's sentence for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i). Previously it was only the BOP that could file this kind of motion, but amidst widespread complaints about the failure of the BOP to file motions on prisoners' behalf, Congress amended the law with the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018), to allow prisoners the right to file their own motions for a sentence reduction if they first exhaust the statute's procedures for initially making a request to the warden to file a motion on their behalf. *See United States v. Hill*, 2020 WL 2542725, at *1 (D. Conn. 2020).

Provided that a prisoner has satisfied the statute's exhaustion requirement, section 3582(c)(1)(A) establishes several criteria for a court to consider when deciding whether to grant the motion for a sentence reduction. First of all, there has to be no less than "extraordinary and compelling reasons" to warrant a sentence reduction. 18 U.S.C. § 3582(c)(1)(A)(i).[3] The statute does not further define this term but it instructs courts to consider whether a sentence reduction is "consistent with applicable policy statements issued by the Sentencing Commission." *Id.* Congress has separately directed the Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples," while also advising that "[r]ehabilitation of the

---

[3] As an alternative to the existence of such "extraordinary and compelling reasons," section 3582(c)(1)(A) allows for motions to be filed by the BOP on behalf of prisoners who are at least 70 years old and have served at least 30 years in prison. 18 U.S.C. § 3582(c)(1)(A)(ii). This alternative is not at issue in this case.

defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C.

§ 994(t).

 In accordance with this instruction from Congress, the Sentencing Commission has

issued a policy statement in the U.S. Sentencing Guidelines that sets forth criteria for what

constitute "extraordinary and compelling reasons." *See* U.S.S.G. § 1B1.13 cmt. n.1 (2018). The

commentary provides, for example, that "extraordinary and compelling reasons" exist if the

defendant "is suffering from a terminal illness" or if the defendant otherwise has a serious

condition "that substantially diminishes the ability of the defendant to provide self-care within

the environment of a correctional facility and from which he or she is not expected to recover."

*Id.* cmt. n.1(A). The commentary further provides for a catch-all "Other Reasons" that "[a]s

determined by the Director of the Bureau of Prisons, there exists in the defendant's case an

extraordinary and compelling reason other than, or in combination with, the reasons described in

subdivisions (A) through (C)." *Id.* cmt. n.1(D).

 As numerous courts have recognized, the Sentencing Guidelines have not yet been

revised to bring them into conformity with the First Step Act's authorization for defendants to

bring their own motions after exhausting administrative procedures. Therefore, to the extent that

the Guidelines commentary purports to vest authority solely with the BOP to make a

determination of "Other Reasons," this delegation is no longer exclusive; courts also have

independent authority to decide whether there are "Other Reasons" that amount to "extraordinary

and compelling reasons" to grant a motion for sentence reduction. *See Hill*, 2020 WL 2542725,

at *2 (citing cases).

 Beyond a court's determination as to whether there exists "extraordinary and compelling

reasons" for a sentence reduction, a court must also "consider[ ] the factors set forth in [18

U.S.C.] section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A).

Therefore, a court must examine the same factors it did when it initially sentenced the defendant,

including the nature and circumstances of the crime, the defendant's history and characteristics,

and the multiple purposes of sentencing, such as providing just punishment, deterring crime,

protecting the public from further crimes by the defendant, and providing the defendant with

rehabilitation. *See* 18 U.S.C. § 3553(a). In addition, a court must determine that "[t]he defendant

is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C.

§ 3142(g)." U.S.S.G. § 1B1.13(2).

### *Factors applying to Miller*

I first address whether Miller has shown "extraordinary and compelling" reasons that

could warrant a sentence reduction. He alleges that the following reasons warrant a sentence

reduction: (1) the risk that COVID-19 and his conditions of confinement pose to his health;

(2) his inability to participate in RDAP while on lockdown at MDC Brooklyn, which impedes his

rehabilitation and prevents him from earning an earlier release date; and (3) his inability to

receive visits from family for the foreseeable future. Doc. #537 at 11-18.

There is no doubt that the COVID-19 pandemic is extraordinary, having killed more than

170,000 people in the United States in recent months. But Miller fails to show that his various

health issues place him at appreciable risk of contracting COVID-19, much less that they make

him particularly vulnerable to the virus's most lethal effects. As the Government has noted, Doc.

#540 at 6, none of his alleged medical conditions are of the sort recognized by the Centers for

Disease Control and Prevention to place persons at superordinate risk to COVID-19.[4] And again,

---

[4] *See* Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), People with Certain Medical Conditions, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html [https://perma.cc/VA4M-CM56] (last updated Aug. 14, 2020).

MDC Brooklyn seems to be managing the pandemic well, with no reported active cases among inmates. Although it is concerning that MDC Brooklyn staff may have discouraged Miller from seeking outpatient health care, it does not change the fact that his current medical vulnerabilities are not of the degree that they constitute extraordinary and compelling grounds for early release.

As to Miller's ability to secure an earlier release date through RDAP, I cannot simply assume that Miller would have successfully completed the program and earned time off his sentence had it been available to him. *See United States v. Easterling*, 2020 WL 3256867, at *2 (D. Conn. 2020). Moreover, Congress has made clear that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason," 28 U.S.C. § 994(t), so his inability to further his rehabilitation through RDAP alone cannot warrant a reduction in sentence.

Nor does Miller's inability to receive visits from family constitute an "extraordinary and compelling" reason for his release. He alleges that there have been "many" instances where telephone and video calls with loved ones have been cut off in federal prisons, Doc. #537 at 13, and that there has not been "adequate time" for telephone calls, *id.* at 17. But many inmates face similar restrictions on in-person visitation, and these allegations suggest that he has been able to keep in touch with his family, albeit not to the extent or in the manner that he would like. In any event, the BOP has announced today that it will resume in-person social visits for inmates at all 122 facilities nationwide no later than October 3, 2020.[5]

Turning to the sentencing factors under 18 U.S.C. § 3553, Miller proposes that he be released to a halfway house and/or required to participate in Support Court or Reentry Court in furtherance of his rehabilitation. Doc. #537 at 19-20. But he has not shown that the other

---

[5] *See* Federal Bureau of Prisons, Bureau to Resume Social Visitation: Non-Contact Social Visits to Resume October 3rd, available at https://www.bop.gov/resources/news/20200902_visitation.jsp [https://perma.cc/B99X-WBJK] (last accessed Sept. 2, 2020).

sentencing factors counsel in favor of his release, with more than two years of his sentence remaining to be served. Miller was a leader in the production and sale of large quantities of heroin and crack cocaine. He did so not because of any personal struggle with addiction but to profit from those who are weaker than him. Doc. #463 at 69. The presence of his loving family was not enough to keep him from a life of crime; it was only when he "saw the walls closing in" that he changed course. *Id.* After considering all of the sentencing factors, I conclude in light of Miller's record that the purposes of sentencing—including just punishment and deterrence— would not be served if he were released at this time. Nor am I sufficiently confident that his early release would not pose a danger to the community.

## CONCLUSION

For the reasons set forth above and for substantially the reasons stated in the Government's opposition memorandum, the motion of defendant Shawn Miller for a reduction in sentence (Doc. #536) is DENIED.

It is so ordered.

Dated at New Haven this 2d day of September 2020.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge